# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:04CV548-H

| | |
|---|---|
| MARTHA ANN HELMS, )<br>       Plaintiff, )<br>)<br>vs. )<br>)<br>JO ANNE B. BARNHART, )<br>Commissioner of Social )<br>Security Administration, )<br>       Defendant. )<br>) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" and "Memorandum in Support ... " (both document #9), filed September 6, 2005; and the Defendant's "Motion For Summary Judgment" (document #10) and "Memorandum in Support of the Commissioner's Decision" (document # 11), both filed October 27, 2005. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Defendant's decision to deny Plaintiff Supplemental Security Income benefits is supported by substantial evidence. Accordingly, the undersigned will <u>deny</u> Plaintiff's Motion for Summary Judgment; <u>grant</u> Defendant's Motion for Summary Judgment; and <u>affirm</u> the Commissioner's decision.

## I. <u>PROCEDURAL HISTORY</u>

On May 3, 2002, Plaintiff applied for Supplemental Security Income benefits ("SSI"), alleging she became disabled on November 1, 1998, due to fibromyalgia and arthritis which resulted

in pain throughout her body. (Tr. 41-44, 48.) The Plaintiff's claim was denied initially and on reconsideration.

The Plaintiff requested a hearing, which was held July 13, 2004, at which Plaintiff, represented by counsel, and her two daughters testified. On July 29, 2004, the ALJ issued an opinion denying the Plaintiff's claim.

Subsequently, the Plaintiff timely filed a Request for Review of Hearing Decision. On September 2, 2004, the Appeals Council denied her request for review making the ALJ's opinion the final decision of the Commissioner.

The Plaintiff filed this action on October 26, 2004, and the parties' cross-motions for summary judgment are now ripe for the Court's consideration.

## II. FACTUAL BACKGROUND

The Plaintiff testified that she was born on October 29, 1956, and was 47 years-old at the time of the hearing; that she lived with her 17 year-old son; that she had completed a G.E.D. program; that she had last worked in 1998 at a cold storage plant, where she labeled boxes, mowed the grass, painted, worked on the roof, and generally performed other tasks as needed; that the heaviest weight she lifted in that job was 40 pounds; that she had other work experience cutting and hauling wood, emptying railcars at a plastic plant, sewing, and tending hogs; and that she had not worked since 1998, when she quit her job at the cold storage plant due to neck and back pain.

Regarding her medical and emotional condition, Plaintiff testified that she suffered arthritis and fibromyalgia; that she had suffered neck and back pain which had required several surgeries; that the only pain medication she was taking was Ibuprofen; that she had a prescription for Hydrocodone,

2

but did not take it regularly; and that she was taking Wellbutrin for her "nerves."

Regarding her daily activities, the Plaintiff testified that she was able to perform "limited" house and yard work, including sweeping and vacuuming the floor, washing dishes, doing laundry, and mowing the yard on a riding lawn mower.

Sheila Compton, one of the Plaintiff's daughters, testified that she saw the Plaintiff about once a week; that the Plaintiff was in pain; and that the Plaintiff could not sit for long periods of time without standing and walking.

Lisa Blanchett, the Plaintiff's other daughter, testified that she saw the Plaintiff monthly; that Plaintiff experienced great pain; and that Plaintiff could not lift her grandchildren.

The record also contains a number of representations by Plaintiff as contained in her various applications in support of her claims. On a Disability Report, dated October 5, 2001, Plaintiff stated that her disabling condition was caused primarily by "[p]ain in [her] whole body ... back, hands, arms and so forth, arthritis, [and] fibromyalgia" (Tr. 48); that she had difficulty squatting; that due to pain in her hands, driving was difficult, and that she would alternate hands holding the steering wheel; that her back hurt after sitting "too long"; and that she was the only person in the home performing household chores. The Agency interviewer who took the report noted that the Plaintiff had some difficulty sitting, standing, and walking, but no difficulty breathing, concentrating, understanding, talking, answering, thinking coherently, walking, seeing, using her hands, or writing.

A Report of Contact, dated October 18, 2001, reflects that Plaintiff said that she had stopped taking her arthritis medication seven or eight months earlier; that each weekday, the Plaintiff woke her then-14 year-old son and "g[ot] him off to school"; that she did housework, included cooking, washing dishes, and cleaning the bathrooms; that she mowed the yard, went bowling with her son,

3

and painted "oil crafts"; that she had no difficulty being around people; that she went grocery shopping, to the post office, and ran other errands; that she went shopping with her daughters; and that she crocheted, usually while watching television; but that Plaintiff claimed to be unable to work due to arthritis and fibromyalgia.

On a Reconsideration Disability Report, dated May 9, 2002, Plaintiff stated that her pain was worse; but did not report that her doctors had placed restrictions on her activities.

A Report of Contact, dated June 19, 2002, reflects that Plaintiff said that she was in pain but had no difficulty taking care of her personal needs; that she cleaned the house, cooked, and drove; that she had no problems dealing with people and was not under psychiatric care; and that Plaintiff denied having any difficulty concentrating.

On an undated Claimant's Statement When Request for Hearing Is Filed, the Plaintiff stated that her condition was worse.

On December 13, 2001, Robert Gardner, M.D., completed a Physical Residual Functional Capacity Assessment and concluded that the Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could sit, stand or walk six hours in an eight-hour work day, and had unlimited ability to push and/or pull with her legs; that Plaintiff should avoid frequent climbing, balancing, stooping, kneeling, crouching, or crawling; that the Plaintiff had limited ability to handle and finger with both hands; and that with these nonexertional limitations, the Plaintiff had the residual functional capacity for light work.

On June 21, 2002, A.K. Goel, M.D., completed a Physical Residual Functional Capacity Assessment and concluded that the Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, could sit, stand or walk six hours in an eight-hour work day, and had unlimited ability

to push and/or pull with her extremities; that Plaintiff should avoid more than occasional stooping and crouching; that the Plaintiff could perform frequent but not continuous activity with her hands and fingers; and that with these nonexertional limitations, the Plaintiff had the residual functional capacity for medium work.

On July 2, 2002, Lavonne Fox, Psy.D., an Agency psychological expert, completed a Psychiatric Review Technique and concluded that the Plaintiff did not suffer a severe mental or emotional impairment; that the Plaintiff suffered depression and anxiety; but that there was no evidence that these conditions caused more than mild, that is, non-disabling, restrictions in the Plaintiff's activities of daily living, social functioning, and concentration.

Although the Plaintiff assigned error to the ALJ's conclusions regarding the opinion of one of her doctors, Dr. E. Hunter Dyer, discussed below, neither party has assigned error to the ALJ's recitation of the medical records that he considered in rendering his decision. After carefully reviewing the medical chart, the undersigned adopts the ALJ's findings of fact as to those records, as follows:

> The medical records show that the claimant has a history of neck and shoulder pain. An MRI of her cervical spine performed in January 2000 revealed a disc protrusion at C6-7 and moderate stenosis at C5-6 and C3-4. She was diagnosed with cervical degenerative disc disease as well as a history of mild carpal tunnel syndrome and fibromyalgia. In March 2000 the claimant underwent a cervical discectomy and arthrodesis at C5-6 and C6-7. The records of her surgeon, Dr. E. Hunter Dyer, show that she recovered well after her surgery and reported that her arm pain had resolved. She was treated for muscle spasm after she was involved in a car accident in June 2000, but x-rays showed solid fusion. When the claimant returned to Dr. Dyer in September 2000, she reported that her neck soreness had resolved. Dr. Dyer found that she had a good range of motion in her neck and he released her to return as needed. The records of the claimant's family physicians show that she was also treated for a number of medical problems, such as bronchitis, tick bites, and gastrointestinal problems, which resolved with treatment (Exhibit 2F, 3F, 6F, 7F).

The claimant was treated by a rheumatologist, Dr. Patrick Box, for fibromyalgia. An examination in March 2001 revealed mild tenderness in her fingers but a Tinel's sign was negative and her grip and fist were described as good. She had slightly decreased flexion in her lumbar spine but no limitation of motion in her upper extremities. X-rays of her lumbar spine performed in October 2001 revealed moderate degenerative disc disease at L2-3 and mild degenerative disc disease at L3-4. X-rays of her left foot revealed mild degenerative changes in her first toe. X-rays of her fingers, right elbow, and left hip were negative. Dr. Tyler Freeman, a consultative physician, examined the claimant in November 2001 and found that she had tenderness and a decreased range of motion in her cervical spine, reduced grip strength and a decreased range of motion in her right wrist, and swelling in her hands and fingers. Dr. Freeman found that the claimant had a full range of motion in her lumbar spine, shoulders, elbows, hands, legs, hips, and knees (Exhibits 4F, 8F).

In January 2002 the claimant reported persistent pain in her neck and lower back. Her examination revealed diffuse tenderness. Dr. Box advised the claimant to undergo a physical capacities evaluation at the physical therapy department of a local hospital and to contact Dr. Dyer. The claimant returned to Dr. Dyer in February 2002, after an absence of more than a year, and reported increasing pain in her lower back and numbness in her hands. She was also treated by her family physician for pain in her hands. EMG nerve conduction studies revealed mild carpal tunnel syndrome but no evidence of cervical radiculopathy. An MRI of her lumbar spine revealed a small disc protrusion at L4-5. Dr. Dyer advised the claimant to take 800 mg. Motrin and to return as needed. The claimant returned in September 2002 and reported increasing pain in her right leg. In November 2002 she underwent a microdiscectomy at L4-5 in November 2002. Her leg pain recurred in December 2002 and she underwent a redo microdiscectomy to treat a recurrent herniation at L4-5 (Exhibit 2F, 3F, 4F).

Additional medical evidence was submitted in connection with the request for hearing. The updated records from Dr. Dyer show that the claimant reported persistent back and right leg pain after her surgery in December 2002. An MRI of her lumbar spine revealed epidural fibrosis and recurrent disc herniation. In February 2003 the claimant underwent a lumbar decompression and fusion at L4-5. The claimant reported improvement after this surgery. Dr. Dyer noted in March 2003 that the claimant was doing well and that he was very pleased with her progress and thought she was going to have an excellent result. Dr. Dyer's nurse wrote in April 2003 that the claimant had called to ask if she could cut the grass and that she advised her to wait for about 3 months, noting that the claimant had a very big yard. The claimant reported in May 2003 that she had mild back pain but complete resolution of her leg pain, that she was very happy with her activities, and that she had started to dial up her activities. Dr. Dyer advised her not to push too soon. In June 2003 the claimant reported occasional aching in her back and neck. Dr. Dyer

advised her that this was to be expected and that he was very pleased with her progress. Dr. John Babich, a rheumatologist, examined the claimant in July 2003. The claimant reported diffuse pain and said that she was applying for long term disability. Her examination revealed multiple tender points and muscle knots but no tenderness or swelling her in her joints. The claimant was diagnosed with fibromyalgia and chronic stress/depression. The updated records from the claimant's family physicians show that she was treated for hand pain in July 2003 and for neck pain and numbness in June 2004 and was also treated for symptoms of fibromyalgia and irritable bowel syndrome (Exhibits 10F-12F)....

The records of the claimant's family physicians show that she was diagnosed with anxiety and depression when she reported that she was under a lot of stress and was not sleeping well, and that she was treated with anti-depressant medication. Dr. Babich later diagnosed chronic stress/depression....

The medical evidence, as discussed above, shows that she reported significant improvement within a few months of her cervical surgery and prior to the filing date of her SSI application. The EMG studies performed in March 2002 showed no evidence of cervical radiculopathy. The claimant reported only intermittent back pain associated with her fibromyalgia and degenerative disc disease in 2001, and the x-rays and clinical evidence show that she did not have a ruptured disc at that time. Although the claimant reported increasing back pain in January and February 2002, the MRI performed at that time showed only a small disc protrusion and Dr. Dyer recommended only the use of Motrin. When the claimant returned to Dr. Dyer in September 2002, she reported that her leg pain had recently increased and her MRI showed progression of her disc protrusion. Dr. Dyer's records indicate that the claimant had intense pain during the period from September 2002 until shortly after her lumbar fusion surgery in February 2003. However, her pain and associated limitations clearly improved within a few months after her surgery in February 2003....

Dr. Dyer wrote in August 2003, in a letter to the claimant's attorney, that the claimant had made some progress since her surgery but was still not able to do any significant work, and that it did not appear that she could be productively employed due to the limitations of motion of her neck and back and her ongoing back pain. (Exhibit 10F)....

Although the claimant needed lumbar fusion after her unsuccessful microdiscectomies, the treatment notes show that her lumbar fusion surgery was very successful. Dr. Dyer repeatedly noted that both he and the claimant called his office in April 2003, only two months after this surgery, and asked if she could cut the grass. She was advised to wait for a few months. No treatment notes have been submitted from Dr. Dyer for the period after June 2003. Dr. Dyer noted at that time that he was pleased with her progress (Exhibit 11F).

(Tr. 12-15.)

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that Plaintiff appeals.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was therefore whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[1] The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity at any time relevant to this proceeding; that the Plaintiff suffered cervical and lumbar disc disease, mild carpel tunnel syndrome, and fibromyalgia, which were severe impairments within the meaning of the Regulations; but that Plaintiff's impairment or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that Plaintiff was unable to perform her past relevant work; that Plaintiff

---

[1] Under the Social Security Act, 42 U.S.C. §301, et seq., the term "disability" is defined as an:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

had the residual functional capacity to perform the full range of sedentary work;[2] that Plaintiff was a "younger individual" with a high school education; and that Vocational-Medical Rule 201.18 directed a conclusion that Plaintiff was not disabled. (Tr. 16-17.)

The Plaintiff appeals the ALJ's determination of her residual functional capacity. See Plaintiff's "Motion for Summary Judgment" and "Memorandum in Support ... " (both document #9). The Plaintiff's assertion of error is without merit, however, that is, substantial evidence supports the ALJ's conclusions regarding the Plaintiff's residual functional capacity.

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged impairments limited her ability to work. Agency psychological evaluators found that the Plaintiff's alleged mental and emotional impairments were non-severe and placed no more than mild, non-disabling restrictions on the Plaintiff's ability to work. In their final evaluation, Agency medical experts concluded that the Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, could sit, stand or walk 6 hours in an eight-hour work day, and had unlimited ability to push and/or pull with her legs; that she should avoid more than occasional stooping and crouching, that the Plaintiff could perform frequent but not continuous activity with her hands and fingers; and that with

---

[2]Sedentary work involves lifting no more than 10 pounds at one time and occasionally lifting and carrying items such as docket files, ledgers, and small tools. See 20 C.F.R. § 416.967(a); SSR 83-10. Sedentary work is performed primarily in a seated position, but occasional walking and standing is often required. 20 C.F.R. § 416.967(a); SSR 83-10. "Occasionally" means from very little up to 2 hours out of an 8-hour work day. SSR 83-10.

these nonexertional limitations, the Plaintiff had the residual functional capacity for medium work.

However, the ALJ found that the Plaintiff was "not disabled" based on her ability to perform sedentary jobs.

The Plaintiff assigns error to the ALJ's determination that Dr. Dyer's opinion, expressed in his August 3, 2003 letter, that the Plaintiff was unable to perform "significant work" was not entitled to controlling weight. The Court finds to the contrary, however, that the ALJ's conclusion was supported by substantial evidence.

The Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

Dr. Dyer's August 3, 2003 opinion was inconsistent with his own treatment notes and other medical evidence of record discussed above. See 20 C.F.R. §416.927(d)(4) (opinions that are inconsistent with the record as a whole are entitled to less weight). The month after the third surgery, Plaintiff reported that she was doing well, and Dr. Dyer noted that he was happy with her progress. On April 17, 2003, Plaintiff called Dr. Dyer's office wanting to know if she could mow her lawn, but she was advised to wait 3 months given that she had a large yard. On May 7, 2003,

Plaintiff reported that she was very happy with her progress. Her back pain was only mild, and her leg pain had completely resolved. She was advised to begin gradually increasing her activities. On June 25, 2003, Dr. Dyer reported that Plaintiff had done well overall and that he was pleased with her progress. Plaintiff reported some aching, at times, in her back and neck, but Dr. Dyer stated that this was to be expected. In short, there was nothing in Dr. Dyer's treatment record to support his conclusion, stated less than two months later, that the Plaintiff was permanently unable to perform "significant" work.

Additionally, the remainder of the undisputed medical record supports the ALJ's conclusion that the Plaintiff suffered, but was not disabled by, cervical and lumbar disc disease, mild carpel tunnel syndrome, and fibromyalgia. Although Plaintiff did undergo surgeries for her cervical and lumbar spine, she was otherwise treated conservatively and at most times was taking only Ibuprofen for pain. Indeed, at the hearing, Plaintiff testified that she had prescriptions for stronger pain medications, but that she tried to avoid taking them and instead primarily took Ibuprofen for her pain. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965).

The record also establishes that the Plaintiff engaged in significant daily life activities during the subject period, such as bathing and dressing herself, performing most, if not all, of the household chores, driving, and performing a wide variety of other activities, including mowing the yard, going bowling with her son and shopping with her daughters, driving, crocheting, and painting. On the

relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work," which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's cervical and lumbar disc disease, mild carpel

tunnel syndrome, and fibromyalgia – which <u>could</u> be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in <u>Craig</u>. However, the ALJ also correctly evaluated the "intensity and persistence of [her] pain, and the extent to which it affects [her] ability to work" and found Plaintiff's subjective description of her limitations not fully credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." <u>Mickles</u>, 29 F.3d at 921, <u>citing</u> <u>Hunter v. Sullivan</u>, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between Plaintiff's claims of inability to work and her objective ability to carry on with moderate daily activities, that is, Plaintiff's ability to take care of her personal needs, do household chores, shop, drive, mow the yard, and care for her son, as well as the objective evidence in the medical records, discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." <u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by her combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's

designate, the ALJ)." Mickles v. Shalala, 29 F.3d 918, 923 (4th Cir. 1994), citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations of the Plaintiff's residual functional capacity.

## V. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. "Plaintiff's Motion For Summary Judgment" (document #9) is **DENIED;** Defendant's "Motion for Summary Judgment" (document #10) is **GRANTED**; and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED.**

**Signed: October 31, 2005**

*Carl Horn, III*
_____

Carl Horn, III
United States Magistrate Judge